HOSMER v. CITY OF DETROIT.

1. WILLS—EXECUTORS AND ADMINISTRATORS—ESTATES OF DECED-
ENTS—CONTROL OF FUND—POWER IN TRUST.
    Under a will bequeathing to the city of Detroit for a foun-
        tain the residue of an estate amounting to the sum of
        over $400,000, appointing two executors and conferring on
        them full power to manage all the estate until the com-
        plete execution of the will, with power to sell, rent, etc.,
        providing, also, that a life-size statue of testator should
        be placed on the fountain and that the plans thereof
        should be subject to approval by the executors, the execu-
        tors were vested with powers in trust until the comple-
        tion of the fountain, and the funds or trust estate were
        to be paid over to the city as work on the structure pro-
        gressed: the city was not entitled to the control of that
        portion of the estate bequeathed for the fountain as soon
        as the debts were paid and the estate collected together.

2. SAME—INTERPRETATION—INTENT.
    The intent of the testator must prevail in interpreting a
        will.

3. SAME—MUNICIPAL CORPORATIONS—DETROIT CHARTER.
    Notwithstanding provisions of the charter of the city of
        Detroit prohibiting the letting of any contract by the
        city until the money to be expended is in the treasury
        or an appropriation made for it, the city is authorized
        to proceed with the construction of the fountain before
        obtaining all the funds which remain in the hands of the
        executors charged with the duty of applying them to the
        purposes named in the testament.

4. SAME—CITIES—FOUNTAIN.
    Erection of drinking fountains is a proper municipal pur-
        pose, for which a gift or devise may be lawfully received
        and expended.

Appeal from Wayne; Mandell, J.   Submitted Janu-
ary 17, 1913.   (Docket No. 79.)   Decided May 28,
1913.

Bill by George S. Hosmer and Clarence M. Burton, executors of the estate of James Scott, deceased, against the city of Detroit and others for a construction of the last will and testament of decedent. From a decree for complainants, defendant city appeals. Affirmed.

*Keena, Lightner, Oxtoby & Oxtoby,* for complainants.

*Walter Barlow (Richard I. Lawson,* of counsel), for defendant city of Detroit.

STEERE, C. J. This suit is before us on an appeal taken by the city of Detroit from a decree of the Wayne county circuit court in chancery construing a clause in the last will and testament of James Scott, deceased, as meaning that complainants were, by the terms of said clause, made donees of a power in trust to carry out the provisions of said will in regard to a fund left to the city of Detroit for the special purpose of erecting a fountain on the "island of Belle Isle."

The complainants, as executors of the last will and testament of said James Scott, deceased, filed this bill against the three defendants, the city of Detroit, Elmwood Cemetery, and Jennie Scott, to obtain the construction of certain paragraphs of said will which provide for the erection of a $20,000 tomb on testator's lot in Elmwood Cemetery, and the interment therein of the bodies of certain of his relatives, and, after the payment of certain bequests and legacies not in controversy, for the erection of a fountain on Belle Isle, to be called "The James Scott Water Fountain," with the proceeds of the residue of his estate. The construction by the court of the provisions of the will relative to the tomb in Elmwood Cemetery was satisfactory to all parties in interest and has not been appealed from.

The estate has been administered by the executors, according to the provisions of the will and without any contention or uncertainties, to the point where a question has arisen over the authority of said executors to retain control of the residue fund yet in their hands, to the extent, and for the purpose, of directing and compelling its proper expenditure by the city, to which it is given, according to the conditions imposed by, and the manifest intent of the testator as expressed in, the will. That portion of the will here involved reads as follows:

"All the remainder of my estate, real and personal, I give, devise and bequeath to the city of Detroit. With the proceeds thereof said city shall build a fountain on the island of Belle Isle. Such fountain shall be built in accordance with plans approved by my executors; said fountain shall be called 'The James Scott Water Fountain.' There shall be placed on said fountain a life-size statue of myself, made in accordance with the directions of my executors.   *   *   *   I hereby appoint as my executors the Hon. Don M. Dickinson and the Hon. George S. Hosmer or the survivor. They shall have full power to manage all of my estate until the full execution of this will, may rent the real estate, insure it, pay taxes, etc. They shall have power to sell and convey the whole or any part in carrying out its provisions.

"JAMES SCOTT."

A codicil to the will provides:

"In the place of the Hon. Don M. Dickinson I make Clarence M. Burton one of my executors, said Burton being at the head of an abstract office in Detroit."

It is the claim of appellant that, inasmuch as all debts of the testator and the several small bequests have been paid and the estate fully administered and the residue thereof has been assembled and ascertained, ready to be expended under the will according to its provisions, the only remaining duty of the executors is to forthwith turn the same over to the

city, to be expended for the purpose it is given, under the direction of the proper municipal authorities.

The testimony in this case shows that testator was in the neighborhood of 75 years of age at the time of his death, that he left no wife or children, and defendant Jennie Scott, a cousin, is his only heir at law and but for the will would inherit his estate. He was born in the city of Detroit and, with the exception of three or four years, always resided in that city. His will, drawn by Charles A. Kent, an eminent attorney of Detroit, was found in the vaults of the Wayne County Savings Bank. After Scott's death, which occurred March 5, 1910, Prof. Kent made known the existence of a will. On his suggestion and under authority of the probate court, it was obtained from the bank and admitted to probate on April 20, 1910. The executors duly qualified and each filed a bond of $50,000.

The estate consisted of personal property, inventoried at $43,741.85, and real estate, inventoried at $357,952. In the probation and management of the estate the executors consulted with the municipal authorities relative to the residue which might ultimately go to the city and kept them advised. At the time of hearing in this suit there was estimated to be the sum of $430,000 available for the erection of the water fountain provided for in the will, consisting of $75,000 worth of real estate yet on hand, land contracts amounting to approximately $200,000, and the balance invested in approved municipal, State, and county bonds. Considerable real estate was sold by the executors, under the power contained in the will authorizing them to sell the whole or any part of the real estate of said deceased, and all sales were reported to the common council of the city of Detroit as they were made.

Shortly after the death of testator, when the provisions of his will, making this large donation to the city for the purpose and on the conditions imposed,

became generally known, objections to its acceptation developed, and the past life of deceased, which it was claimed by some had not been altogether exemplary, was a fruitful topic of more or less acrimonious discussion. The propriety of the city accepting the alleged tainted money of a gambler to be expended in perpetuating his memory by erecting, on public grounds and in its most beautiful park, an elaborate fountain, crowned by his life-size statue, became a popular subject for moral reflections, both in the pulpit and public press. Protests were filed with the city council and urged at public meetings.

The record of proceedings of the common council show that on November 29, 1910, the commissioner of parks and boulevards was directed, in response to a communication from the executors, to accept the gift. As a result of protests presented to the council, the vote of acceptance was reconsidered and the matter referred back to the proper committee. This committee held a public meeting, which apparently took the form of a *post mortem* inquisition on Mr. Scott's former life and activities. On December 20, 1910, said committee reported to the council in part as follows:

"An opportunity was afforded the public to appear before your committee and present their objections, if any, as well as those who were in favor of its acceptance. After considering all that has been said, we are inclined to believe that those objecting have been misled as to the occupation and character of the deceased. The statement is made that 'his occupation was not in accord with the best interests of society and safe business principles,' yet not a single voice accused or even intimated in the slightest degree that he was dishonest or ever attempted to wilfully or knowingly wrong any one; no one questioned his integrity, and his occupation was that sought by ninety-five per cent. of the American people, a 'Retired Capitalist.' * * * The only thing which is pointed to as being against him are the follies of youth, and those he discarded over 40 years ago. * * * He

made mistakes and so have most of us, and when he came to a full realization of it, he not only corrected them with himself, but constantly advised others to shun doing those things which might and would affect their standing in the community, in a social way or from a commercial standpoint"—

and again recommended acceptance of the gift.

With these assurances on the part of the committee the council, on December 20, 1910, approved the report. On December 27th a plebiscite was proposed by a resolution introduced to submit the acceptance or rejection of the gift to popular vote, which was defeated by a large majority. The executors, during this agitation, proceeded undisturbed in the administration of the estate in accordance with the provisions of the will and in due time requested the common council to formally accept the donation, which, as shown, was eventually done. The executors kept the city officials advised of the progress being made in settling the estate, from time to time making reports and submitting their action to the council for approval. The sales of real estate made by them, investment of funds, and general course of conduct in handling and conserving the assets of the estate have been acceptable to the municipal authorities and were formally approved by the common council. Nothing has yet been done towards erecting the proposed fountain except the preparation of some plans by the city park and boulevard committee, and conferences between the executors and the municipal authorities over such plans and in regard to the location of the fountain. A proposal was made, through the mayor, that a portion of the legacy be devoted to filling in the ground at the lower end of the island to increase its area, at an estimated cost of $200,000, to which the executors would not consent; it being their opinion that such use of the fund was not permitted by the terms of the will. They also took the same view of

the suggestion that a portion of the fund be set aside for endowment or maintenance of the fountain.

It is undisputed that the city of Detroit, having formally accepted the gift, is the residuary devisee and legatee of deceased, vested with the title to the remaining funds of the estate, in trust for the erection of a water fountain according to the conditions imposed by the will. For the city, it is contended the time has arrived when it is entitled to the custody and control of this residue, now defined and ascertained, and the executors should turn the same over to it that it may forthwith proceed with the work of erecting the fountain as provided by the terms of the testator's will, subject only to the approval by the executors of the plans for the same; that the work of the executors ends and they have fully performed their official duty when they pay the debts, assemble the assets of the estate, and pay over to the beneficiaries their respective portions, and, in case of the fountain fund, approve the plans which the city proposes.

If the will only imposes upon them the duties of ordinary executors, this contention is correct, and the city, after obtaining the fund, would be required to expend it according to the terms of the donation, subject only to the restraint of a court of chancery, which might be appealed to by any one interested, in case the trust was being violated. Was it the intent of the testator, as manifested by the will, to leave this large fund in that condition?

The will leaves this residue "to the city of Detroit. With the proceeds thereof said city shall build a fountain on the island of Belle Isle." That it can only build it in accordance with plans approved by the executors is distinctly stated. Of that duty in relation to the fountain there can be no question, and to that extent, at least, they were to control its erection. The will also confers on them other general powers

175 MICH.—18.

beyond those of one simply designated and appointed an executor. It specifies that:

"They shall have full power to manage all of my estate until the full execution of this will, may rent the real estate, insure it, pay taxes, etc. They shall have the power to sell and convey the whole or any part in carrying out its provisions."

Counsel for appellant say this case turns on the meaning of the words "until the full execution of this will," and contend such language should be construed to mean that stage of the probate proceedings where funeral expenses, debts, and specific legacies have been paid and the residue of the estate assembled and ascertained, so that nothing remains but to render a final account and distribute such residue; that the duties of the executors as such are then closed except for the adjustment of their accounts. In support of this contention counsel cite and rely on *Calkins* v. *Smith's Estate,* 41 Mich. 409 (1 N. W. 1048) ; *In re Lamb's Estate,* 122 Mich. 239 (80 N. W. 1081). The construction contended for was placed upon similar language in those cases in passing upon wills which contemplated a different disposition of portions of the estates in case certain beneficiaries should die before the executors concluded the performance of their official duties. The gist of each of those decisions is that the executors were not required nor allowed to protract the administration of the estate by waiting for some one to die. In *Calkins* v. *Smith's Estate,* the testator provided in his will for other disposition of a bequest of $1,000 to his wife in case she died before his estate was settled. The court interpreted that language in the will, in the light of its other provisions and the facts surrounding the case, as meaning that a settlement of the estate was "the stage of the proceedings when the funeral expenses, debts, and legacies are paid, and when nothing remains but to pro-

ceed with the steps for a division of the residue," saying: .

"That is put beyond doubt by the ninth clause of his will, in which this thousand dollars is named among the sums to be paid before the residue is distributed.   *   *   *   Conditions are not favored in law when they defeat estates, and they should not for a moment be subject to be continued at the option or through the misconduct or neglect of others where any other conclusion is reasonable."

In *Re Lamb's Estate, supra,* the court was called upon to construe the language, "but in case of the death of any of the above legatees previous to the probation or execution of this my last will and testament," the testator having left all of her estate to her brothers and sisters, naming them, share and share alike. As applied to that will, under the circumstances of the case, the court said the word "execution" manifestly applied to something to be done after testator's decease and contemplated the action of the executor in carrying the will into effect, or execution, by disposing of the assets according to its terms. Speaking of one of the beneficiaries, the court said:

"At her death Mr. Ray received an estate upon the sole condition that he live until the will was executed, and the property ready for distribution. This was the construction placed upon similar language in *Scott* v. *Guernsey,* 60 Barb. [N. Y.] 163, 175, and *Lambert* v. *Harvey,* 100 Ill. 338, and is not in conflict with *Calkins* v. *Smith's Estate,* 41 Mich. 409 [1 N. W. 1048]."

Each of those cases involved contingencies in the distribution of the estates, depending on the death of beneficiaries, and the court in construing those wills emphasized the rule that the intention of the testator must govern and must be determined from the will taken as a whole in the light of existing conditions as proven.

Conceding that counsel's contention is correct and that by strict construction the point has been reached

where the duties of the executors as such are practically at an end, and the will executed, we still have the more important question before us of the intent of the testator and meaning of his will as to the rights and duties and powers in trust of the executors under the terms of the will "in carrying out its provisions," whether it be as executors or trustees. That a power may be granted with a devise or bequest to others than the beneficiaries, and such power conferred upon the same persons who are appointed executors of decedent's will, the authority to exercise, or execute, the power being derived from the will, is beyond question. This rule is recognized in *Calkins* v. *Smith's Estate, supra,* and borne out by many authorities.

Had the testator in this case devised the residue of this estate to the executors in trust with the power of sale, they would be vested with the title; but here the executors are given the power of disposing of the estate without an express devise to them for that purpose; they therefore do not take the legal title to the estate, which is vested in the city. Although the estate is not vested in the executors, they are invested with the power of disposition, or sale, in carrying out the provision of the will. This power of disposition has a significant bearing on the authority or power intended to be given to the city as well as the executors, and implies, read in connection with other parts of the will, certain co-ordinate powers in trust given to each. The will provides that the city shall build the fountain "with the proceeds" of the residue of testator's estate, real and personal. While manifestly intending that this estate shall be converted into money, which would be the proceeds essential to the erection of the fountain, the executors are not only given full power to manage this property by insuring, paying taxes, collecting rent, etc., but "to sell and convey the whole or any part in carrying out" the provisions

of the will; thus clearly, we think, indicating an intention on the part of the testator that, while the title to the residue is vested in the city, the executors are to have the power of managing this property and of converting it into money available for the erection of the fountain in question, it being their duty to pay it to the city as needed to enable it to proceed with its task of building the fountain according to plans which said executors may approve.

The cardinal rule of testamentary construction, that the intent of the testator must prevail, is too well settled to require the citation of authority. Whatever construction may be placed upon corresponding words in other wills, the natural, manifest, and lawful intent of the testator in the particular will under consideration is not to be defeated. There are no irreconcilable provisions in this will, calling for a strict and technical interpretation of the language used; there are no contingencies or uncertainties as to what is to be done, and what the testator intended should be done, in the application of this fund to a certain project.

It is strenuously contended by counsel for defendant that the funds must all be paid over to the municipality before any steps can be taken for the erection of this fountain, because the city charter prohibits the letting of any contract by the city until the money proposed to be expended under said contract is actually in the treasury or an appropriation made therefor.

We do not regard any provision of the city charter along that line as a serious obstacle to the execution of this trust. Those provisions relate to public improvements, such as pavements, sewers, buildings, and other public work to be paid for with money raised by taxation, and so require that the money be in the treasury "or an appropriation made therefor before the liability is incurred." The city has authority from its charter to accept and devote to public pur-

poses, either of use or ornament, gifts of real or personal property.

"The erection of a drinking fountain is a proper municipal purpose and a city may take a devise therefor." 3 Dillon on Municipal Corporations, § 981.

With the funds on hand, held by the trustees whose duty it is to pay it over as the necessities of the work demand, and with this fund in gilt-edged securities, much of it in bonds of the city of Detroit itself, or in cash, we see no difficulty in holding that an appropriation has been made therefor. We think contractors, under such circumstances, would be perfectly safe in entering into a contract with the city for the erection of a fountain according to the conditions imposed by the will, and the contention that such a contract would not be binding upon the city nor create an equitable lien upon the fund in the hands of the trustees is not well founded.

The trial judge has stated very clearly the significance of certain portions of the evidence and the application of the same to the construction of this will in the following language:

"Mr. Scott is shown by the evidence to have been a peculiar man, somewhat self-willed. He was a man of the world, well versed in the weaknesses and frailties of all sorts of men who make up society. He was a man who, with no slight touch of vanity, wanted things as he wanted them, and he usually had his own way. He wanted and willed that the largest portion of his estate should be devoted to the perpetuation of his memory in a beautiful fountain to be named 'The James Scott Water Fountain,' and that such fountain should contain a life-size statue of himself. Considering his character and knowledge of affairs as shown by the evidence, he evidently wanted every last penny, left for the purpose, to be strictly and honestly put into the monument. His selection of executors, not from the average business man, nor from among his intimate personal friends, nor from artists who could readily approve plans to be adopted, but of two

public men of well-known probity and honesty of purpose who could and would see to it that his desire should be carried out to the letter, taken in connection with the evidence, aid greatly in a determination of what testator meant in using the language employed in the will, and clear up any apparent ambiguity found therein. With the assistance of this evidence it becomes clear that James Scott desired and willed that his executors should see that his intentions with regard to the monument were strictly carried out, and so, in and by the will, he made them more than mere executors; he made them donees of power in trust. * * * The executors are given power in trust to safeguard and manage the estate, to convert it ultimately into money, and out of the proceeds to pay for the erection of a fountain by the city under plans that will meet their approval both as to taste of design and also, as well, of a character that will exhaust the moneys and all of the moneys left by testator for that purpose."

We conclude it is evident from the language of the will, considered in its entirety, made more clear by facts and surrounding conditions shown, that the testator intended to and did designate his executors to act as an independent controlling authority, free from changing officials and changing public opinion incident to municipal administration, and invested them with restraining power to so guard this large, and, as he well knew, to some, an obnoxious, donation, so that, if it was accepted by the city, the conditions he imposed would be strictly observed. In so providing he vested the title to the property in the donee, in trust for the purpose specified, dominant to which he conferred upon the executors a continuing power in trust to convert the property into cash, or available proceeds, to be conserved by them and only paid to the city as the work done by it, in the performance of its trust, might require. We see no legal obstacle to these parties working in co-operation, within the scope of the special authority given to each, and har-

moniously proceeding to carry out the provisions of the will as interpreted.

The construction placed upon said will by the learned circuit judge is sustained, and the decree is affirmed.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.